**IN THE UNITED STATES DISTRICT COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| **RCI ENTERTAINMENT (SAN ANTONIO), INC. D/B/A XTC CABARET,** | § § § § | |
| *Plaintiff,* | § § | |
| **v.** | § § | **CIVIL ACTION NO. 5:21-cv-00194** |
| **THE CITY OF SAN ANTONIO, MAYOR RON NIRENBERG, AND MICHAEL E. SHANNON, DIEUDONNE JAOSIDY, JOSE GUTIERREZ, AND ISRAEL VILLA, IN THEIR INDIVIDUAL AND OFFICIAL CAPACITIES,** | § § § § § § § | |
| *Defendants.* | | |

**PLAINTIFF'S VERIFIED ORIGINAL COMPLAINT AND**
**APPLICATION FOR PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF**

Plaintiff RCI Entertainment (San Antonio), Inc., d/b/a XTC Cabaret files this Original Complaint and Application for Preliminary and Permanent Injunctive Relief against Defendants, the City of San Antonio, Texas, Mayor Ron Nirenberg, Michael E. Shannon, Director, Development Services Department, Dieudonne Jaosidy, and Israel Villa in their individual and official capacities.

**SUMMARY**

1.      Plaintiff seeks relief from the City of San Antonio's unlawful revocation of Plaintiff's Certificate of Occupancy for alleged violations of COVID-19 restrictions, which has destroyed Plaintiff's business. However, the City of San Antonio's decision to enforce these COVID-19 restrictions is a pretext. The City actually wants to shut down Plaintiff's exotic dance club, XTC Cabaret, for reasons that are unrelated to containing the spread of the virus. Instead of

pursuing its objectives by filing a lawsuit, the City simply summarily and permanently revoked Plaintiff's Certificate of Occupancy for "failure to practice social distancing."

2.      Furthermore, the revocation was made under the color of mayoral declarations which on their face do not give the City of San Antonio the authority to shut down Plaintiff's business. The revocation also contravenes Governor Greg Abbott's executive order GA 32. The only mayoral declaration which even arguably provides a basis for revocation of Plaintiff's Certificate of Occupancy was promulgated on November 25, 2020, *after* the citations (September 12, November 6, November 7, and November 21)[1] made the basis of the revocation. (Exhibit A, Eleventh Addendum to 8th Declaration of Public Health Emergency Regarding COVID-19 dated November 25, 2020, p. 6; *see* Exhibit B, 8th Declaration dated June 4, 2020).

3.      The City's actions are not only without basis in any statute or ordinance and are *ultra vires*, but they violate Plaintiff's most basic due process rights. Faced with ongoing business closure caused by Defendants' unlawful actions resulting in irreparable injury, Plaintiff is now forced to ask this Court for immediate injunctive relief.

## JURISDICTION & VENUE

4.      This Court has original jurisdiction pursuant to the following statutory and common law claims:

(a)      Defendants' acts, omissions, and wrongful conduct are violations of the First and Fourth Amendments of the United States Constitution;

(b)      Defendants' acts, omissions, and wrongful conduct violate Plaintiff's civil rights and are actionable pursuant to 42 U.S.C. § 1983.

5.      Under 28 U.S.C. § 1331, this Court has original jurisdiction over all civil matters arising under the laws of the United States.

---

[1]      Exhibit C, September 12, 2020 Emergency Declaration Stop Work Orders; Exhibit D, November 6, 7, and 21, 2020 Emergency Declaration Violations.

6. Plaintiff is a business incorporated and doing business in Bexar County. The principal activities complained of occurred within or were originated from Bexar County, Texas. Therefore, venue is proper in this Court.

## PARTIES

7. RCI Entertainment (San Antonio), Inc., d/b/a XTC Cabaret, is a Texas corporation doing business in Bexar County, Texas.

8. Defendant City of San Antonio, including its respective departments, agencies, and other instrumentalities, is a home rule municipal corporation organized under the laws of the State of Texas. When this Complaint refers to Defendant City of San Antonio, it includes those persons acting in an official capacity for the City. It may be served through the City Attorney, 203 S. St. Mary's Street, 2nd Floor, San Antonio, Texas 78205.

9. Defendant Ron Nirenberg is sued in his official capacity as Mayor of the City of San Antonio. He may be served through the City Attorney, 203 S. St. Mary's Street, 2nd Floor, San Antonio, Texas 78205.

10. Defendant Michael E. Shannon is sued in his official capacity as the Director of the City of San Antonio Development Services Department ("DSD") and in his individual capacity. He may be served through the City Attorney, 203 S. St. Mary's Street, 2nd Floor, San Antonio, Texas 78205.

11. Defendant Dieudonne Jaosidy is an individual residing in Bexar County, and he may be served at 1901 S. Alamo St. San Antonio, Texas 78204 or wherever he may be found.

12. Defendant Jose Gutierrez is an individual residing in Bexar County, and he may be served at 1901 S. Alamo St. San Antonio, Texas 78204 or wherever he may be found.

13.     Defendant Israel Villa is an individual residing in Bexar County, and he may be served at 1901 S. Alamo St. San Antonio, Texas 78204 or wherever he may be found.

## OVERVIEW OF RELEVANT COVID-19 ORDERS

14.     To begin, it is important to understand the legal context for the web of state and local COVID-19 decrees that has evolved over the course of the pandemic.

### I.     Governor Abbott's Executive Orders

15.     First, all of Governor Abbott's executive orders issued in response to the ongoing COVID-19 disaster have been issued pursuant to Chapter 418 of the Government Code, the Texas Disaster Act of 1975. Subchapter B of Chapter 418 sets forth the "Powers and Duties of Governor" during a disaster. A governor may "issue executive orders, proclamations, and regulations and amend or rescind them" which "have the force and effect of law." TEX. GOV'T CODE § 418.012. Relevant here are two executive orders.

### A.     GA-29—Face Mask Order

16.     First, GA-29—the 'facemask order'—was issued on July 2, 2020. It provides that:

> Every person in Texas shall wear a face covering over the nose and mouth when inside a commercial entity or other building or space open to the public, or when in an outdoor public space, wherever it is not feasible to maintain six feet of social distancing from another person not in the same household[.]

(Exhibit E, GA 29).

17.     GA-29 spells-out the penalties for failure to comply. After a "verbal or written warning … a person's second violation shall be punishable by a fine not to exceed $250. Each subsequent violation shall be punishable by a fine not to exceed $250 per violation."

### B.      GA-32—Operative Occupancy Limitation

18.      On October 7, 2020, the Governor issued Executive Order GA-32. (Exhibit F, GA-32). As the El Paso Court of Appeals recently explained, GA-32 "makes various declarations regarding occupancy, the size of group meetings, activities that person[s] may engage in, and the conduct of business. And as such, those declarations become state law." *State v. El Paso County*, 08-20-00226-CV, 2020 WL 6737510, at *6 (Tex. App.—El Paso Nov. 13, 2020, no pet. h.), mandamus dismissed (Nov. 20, 2020). It has three components that are relevant here.

19.      First, GA-32 establishes a generally applicable occupancy rule: "[e]very business establishment in Texas shall operate at no more than 75 percent of the total listed occupancy of the establishment." Numerous exceptions apply. For example, "[i]n areas with high hospitalizations…any business establishment that otherwise would have a 75 percent occupancy or operating limit may operate at up to only 50 percent."

20.      Second, GA-32 repeats the longstanding enforcement proviso: "failure to comply with any executive order issued during the COVID-19 disaster is an offense punishable under Section 418.173 by a fine not to exceed $1,000, and may be subject to regulatory enforcement[.]"

21.      Third, GA-32 "supersede[s] any conflicting order issued by local officials in response to the COVID- 19 disaster, but only to the extent that such a local order restricts services allowed by this executive order."

### II.      City of San Antonio's Orders

22.      Under the Disaster Act, mayors are "designated as the emergency management director for the officer's political subdivision." TEX. GOV'T CODE §418.1015(a). Mayors may declare a local state of disaster, *id*. at § 418.108(a), and exercise the powers granted to the governor

under this chapter on an appropriate local scale," *id*. at § 418.1015(b), such as "control[ling] the movement of persons and the occupancy of premises in [the] area." *Id*. at § 418.108(g).

23.     However, GA-32 suspends both Section 418.1015(b) and 418.108 "to the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with this executive order…."

**A.     Eighth Declaration of Public Health Emergency**

24.     As with the Governor, San Antonio Mayor Ron Nirenberg has issued a series of emergency declarations. Relevant here is the Eighth Declaration of Public Health Emergency Regarding COVID-19 ("Eighth Declaration") issued on June 4, 2020 and that remains in effect by virtue of the City Council extending it indefinitely on June 11, 2020.

25.     With the Eighth Declaration, the Mayor adopted the Governor's executive orders in effect at the time, as well as "any subsequent orders by the Governor," and declared that "all prior Declarations, orders and emergency measures are superseded by this most recent Declaration."

26.     The Eighth Declaration itself is otherwise largely silent about COVID-19 restrictions. Instead, those restrictions have been included in the subsequent addendums.

27.     Each addenda essentially adopts the Governor's executive orders. For example, the Ninth Addendum issued September 4, 2020 purports to "identif[y] more stringent measures that are necessary to mitigate the spread of the COVID-19 virus…." (Exhibit G, Ninth Addendum to 8th Declaration). Thus, under section 2, all commercial entities are required to "develop and implement a health and safety policy." *Id.*, § 2. Such policies must require, at a minimum, that "all employees, customers, or visitors to the commercial entity's business premises … wear face coverings" when engaged in activities that necessarily involve close proximity. *Id.*

28.     Under section 4, large gatherings "estimated to be in excess of 10 people outdoors are prohibited" unless they fall within thirteen delineated exceptions. *Id.*, § 4.  Organizers of "any large gatherings or events" described in seven of those excepted circumstances must implement a policy that requires face coverings. *Id.*

29.     However, no penalty was specified for a commercial entity's failure to comply with section 2. In contrast, section 4—applicable to gatherings "in excess of 10 people outdoors," provides that an organizer or entity's "[f]ailure to develop and implement the Health and Safety Policy required by this Addendum may result in a fine not to exceed $1,000 for each violation." *Id.*, § 4. The Tenth Addendum issued on September 21, 2020 mirrors the Ninth Addendum's requirements. (Exhibit H, Tenth Addendum to 8th Declaration). No Addendum or Emergency Order in effect at the time the City of San Antonio issued citations to Plaintiff authorized revocation of Plaintiff's Certificate of Occupancy as an enforcement mechanism.

30.     Eighteen days after the last citation issued by the City to Plaintiff, the Eleventh Addendum issued on November 25, 2020 for the first time provided that a violation of the Eighth Declaration can be enforced via revocation of a Certificate of Occupancy. (Exhibit A, p. 6).

## **FACTS**

31.     XTC Cabaret is a BYOB establishment that features exotic dancing. Because it is not a "bar" as defined in the Governor's executive orders, it has remained open to the public during the pandemic.

32.     On July 15, 2020, officers with the San Antonio Police Department ("SAPD"), responding to a complaint, appeared at the club to make sure that social distancing protocols were being followed inside. The manager on duty, Rod Ybarra, gave the officers an overview of the

procedures the club had implemented to ensure that health guidelines were being followed. The officer looked inside the club, saw that everything was in order, and departed.

33.     In early September, SAPD vice squad officers began appearing at the club to investigate an issue wholly unrelated to COVID-19 and brought along with them building code officials from the City's DSD.

34.     On September 6, 2020, an official with the DSD's "Emergency Response Team" appeared at Plaintiff's establishment and issued a "Emergency Declarations—Stop Work Order" for alleged violation of social distancing protocols.

35.     During the evening hours of September 11-12, 2020, police officers appeared at the Club and made arrests unrelated to any COVID-19 restrictions. A DSD official was also in tow, and took the opportunity to issue two new "violations:"





(Exhibit C, pp. 1-2).

36.     Police and DSD officials appeared at the club yet again on November 6 and 7. The DSD official asked to see the club's permits, which were provided. Nevertheless, another citation was issued for 'social distancing' and failure to post proper signage concerning social distancing. (Exhibit D, pp. 1-2).

37.     On November 10, 2020, Amin Tohmaz, Deputy Director for the DSD, sent Plaintiff "Notice of Intent to Revoke Certificate of Occupancy." (<u>Exhibit H</u>, Notice of Intent to Revoke Certificate of Occupancy).

38.     After citing City Ordinance 2020-03-0217,[2] Mr. Tohmaz recapitulated the citations described above and concluded that "[p]ursuant to City Code 10-12, the building official is authorized to revoke a certificate of occupancy based on violation of any ordinance or regulation." That is not quite the case—code section 10-12 provides as follows:

> *Revocation.* The building official is authorized to suspend or revoke a certificate of occupancy or completion issued under the provisions of this chapter wherever the certificate is issued in error, or on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of *<u>this chapter</u>*.

> SAN ANTONIO MUNICIPAL CODE OF ORDINANCES, Subchapter 10 – Building-Related Codes, § 10-12 (emphasis added). Clearly, the COVID-19 protocols allegedly violated do not fall within Building-Related Codes or Subchapter 10.

39.     Despite lacking a basis under the Code's subchapter as required by its own language, Mr. Tohmaz continued that "pursuant to Exhibit 1 of Emergency Declaration #5, Section (b), the City is authorized to revoke the certificate of occupancy based on repeat violations," and that "you are hereby on notice that the City shall revoke your certificate of occupancy should any further violations occur."

40.     The authority Mr. Tohmaz relies upon provides no basis for revocation either. Exhibit 1 to the 5th Declaration expired by its own terms on April 9, 2020, provided that no bars

---

[2]     *See* <u>Exhibit J</u>,  Ordinance 2020-03-26-0217, which provides only that "[a] person violating any provision of this ordinance, upon conviction, is punishable by a fie up to $2,000 per incident, and any other penalties as authorized by state law and the City Code." It attached and incorporated the Mayor's 5th Declaration, issued March 23, 2020, which has long since expired and been superseded. (<u>Exhibit K</u>, 5th Declaration and Exhibit 1).

or restaurants could operate as a dine-in establishment, and required that all non-essential businesses must be closed. (Exhibit K). Its addendum, which expired at the same time as the order, provides that the City will pull the certificate of occupancy for violations of Emergency Order No. 5. (Exhibit L, p. 1). The City's enforcement action against Plaintiff took place six months after this Order and the Addendum's expiration.

41.     Although the citations lack basis, are couched in vague terms, and are completely untethered from building code issues, the club did not simply ignore them. Its management moved tables apart to prevent customers from congregating in tight groups. Plaintiff also began enforcing the face covering requirement even more stringently.

42.     At around 11:00 p.m. on November 21, 2020, police and DSD personnel reappeared at the club. The six dancers then present all had masks on. About 40 customers were in attendance and were also complying with face mask requirements and social distancing protocols. The responding officials commended the club's efforts.

43.     But then, one of the officials decided to visit the dancers' dressing room, where performers will chat, eat, and put on their make-up and attire. Upon his return, the official alleged that the dancers were not wearing face masks or staying exactly six feet apart while getting ready to perform. The DSD official gave the club another 'violation' notice and departed.



(Exhibit D, p. 3).

44.     On November 24, 2020, Michael E. Shannon, Director of the DSD, issued a letter to Plaintiff stating that its Certificate of Occupancy was revoked. (Exhibit M).

45.     Both Director Shannon and the Mayor announced the City's action to the press.[3] Director Shannon is quoted as saying that "[o]nce they go through that application process and we do an inspection and we feel that they are ready to heed our rules and regulations then we'll issue them an new certificate of occupancy but not until then[.]"

46.     The next day, the Mayor signed the Eleventh Addendum, which included a new addition:

> **13. Enforcement.** Pursuant to Texas Government Code Section 418.173(b), violating any provision of this Addendum and upon conviction, is punishable by a fine up to $1,000.00 per incident, unless an alternate penalty is described within a specific Section of this Addendum, and any other penalties authorized by state law and the City Code. In addition to enforcement through citation and fine, the City may exercise its authority to further enforce compliance with the Mayor's Declaration and this Addendum for violations by businesses by revoking the Certificate of Occupancy for those violating businesses.
>
> _____
> **MAYOR RON NIRENBERG**
> City of San Antonio, Texas

(Exhibit A, p. 6).

47.     Management—having been informed by officials that they would be arrested if they chose to reopen—kept the club closed over the Thanksgiving Holiday.

48.     On November 24, 2020, Plaintiff, through its counsel, reached out to City officials to discuss what additional policies or protocols the club must implement in order to restore its Certificate of Occupancy. On December 1, 2020, Jenny Ramirez with the City Attorney's office provided the requested protocols. (Exhibit N, Email from Jenny Ramirez at the San Antonio City Attorney's Office). Plaintiff immediately jumped into action and provided Ms. Ramirez with a

---

[3]     Darian Trotter, City revokes XTC Cabaret certificate of occupancy for 'repeated' offenses, WOAI, Channel 4, Nov. 24, 2020, https://news4sanantonio.com/news/local/city-revokes-xtc-cabaret-certificate-of-occupancy-for-repeated-offenses.

proposed compliance plan. (Exhibit O, Plaintiff's COVID-19 Health and Safety Plan). Ms. Ramirez had to leave work to attend to personal matters and was not able to coordinate further. The next representative told Plaintiff to go through the administrative appeal process to recover a revoked Certificate of Occupancy, a process that would take months. Having exhausted its ability to work with the City and its attempts to go above and beyond to ensure all possible COVID-19 precautions were being strictly followed, it turned to the courts for relief.

49.     Following this unlawful closure, Plaintiff filed suit in Bexar County District Court, alleging the same facts as the instant action but seeking relief under state law. Cause No. 2020CI23536, *RCI Entertainment (San Antonio), Inc. d/b/a ETC Cabaret v. The City of San Antonio, et al.* On December 18, 2020, the state court conducted a full evidentiary hearing on Plaintiff's application for temporary injunction. Unbeknownst to Plaintiff's counsel until very recently, Judge Alvarez made the following ruling and findings on December 21, 2020:

- Petitioner's Request for Injunction is GRANTED; and

- COSA [City of San Antonio] shall reinstate Petitioner's certificate of occupancy beginning today, December 21, 2020;

And the following findings based on the evidence presented at the temporary injunction:

- Court finds COSA exceeded its explicit authority to revoke a business' certificate of occupancy on November 23, 2020;

- Court finds COSA's ability to revoke a business certificate of occupancy for violation of the Emergency Declaration orders was explicitly noticed in the 11th Addendum to the 8th Emergency Declaration Order signed and in effect beginning November 25, 2020; and

- Court finds COSA has exercised arbitrary control over the administrative process since it afforded the DSD emergency/ex parte relief prior to the BOA January 11, 2021 hearing setting without providing the same opportunity for Petitioner.

(Exhibit Q, Judge's Notes, December 21, 2020, pp. 1-2). This information was and is quasi-public—the docket sheet indicates that there are "Judges Docket Notes" on December 21, 2020, but the contents of this information can only be obtained via direct request to the Court Clerk.  (*See* Exhibit P, Docket Report, p. 3).

50.     For reasons untold, Judge Alvarez ruling was never disseminated to the parties. Plaintiff continued to remain closed through the remainder of December and into January of this year. On January 7, 2021, Judge Gonzalez heard the case on the rotating docket, and orally granted Defendants' Plea to the Jurisdiction for failure to exhaust administrative remedies from the bench. On January 11, 2021 and prior to entry of a written order, Plaintiff nonsuited. (Exhibit P, Docket Report, p. 2).

51.     On the same day, the Board of Adjustment heard Plaintiff's final administrative appeal of the DSD Director's revocation of Plaintiff's certificate of occupancy. The appeal was denied on an eight to three vote.

52.     On February 11, 2021, counsel for Plaintiff became aware of the Judge's Note[4] and that it had prevailed on its Temporary Injunction all along. On February 25, 2021, Plaintiff opened its doors to the public. San Antonio police officers and DSD officials swarmed the business, and loitered outside in a threatening manner:

---

[4] In the course of reviewing the clerk's record for an appeal of the District Court's order out of an abundance of caution and despite the fact that the case was nonsuited prior to entry of the dismissal order.



53.    Looking for an excuse to exact retribution on the Plaintiff for opening without their permission, they issued another citation for failure to observe COVID-19 protocols, ticketing the business because a waitress lowered her mask to take a drink of water.

54.    On February 26, 2021, the City of San Antonio sought a Temporary Restraining Order against Plaintiff on the grounds that it could not operate without a certificate of occupancy. As counsel for Plaintiff successfully argued at that hearing, the remedy for operating without a certificate of occupancy for a commercial establishment is a $200 fine, not an injunction of closure. (*See* Exhibit S).

55.    That very same night, Officer Israel Villa issued a "Stop Work Order" threatening to shut off Plaintiff's electricity for operating without a certificate of occupancy. (Exhibit R). Faced with the imminent threat of having its power shut off, Plaintiff now seeks judicial relief to save its business.

## CAUSES OF ACTION

56.     42 U.S.C. § 1983 provides that a person who, acting under color of law, subjects or causes to be subjected any United States citizen to the deprivation of any rights, privileges, or immunities secured by the United States Constitution, shall be liable to the party injured in an action at law.

57.     At all relevant times and regarding all relevant actions of the Defendants as alleged in this Complaint, the Defendants were acting in their official capacities, under color of state law, and pursuant to the official policies, practices and customs of the governmental agencies or entities which the Defendants respectively represent.

58.     Defendants, acting under color of law, have subjected and caused Plaintiff to be subjected to the deprivation of its rights, privileges, or immunities as secured by the First, Fourth and Fourteenth Amendments.

59.     Specifically, Defendants have violated Plaintiffs' civil rights by shutting down the business without legal basis.

**Due Process Violations for Government Action without Legal Authority**

60.     Defendants' have no statutory basis (under the Texas Penal Code or otherwise) to close the Plaintiff's operations or revoke Plaintiff's certificate of occupancy (pursuant to Governor Abbott's order or otherwise).

61.     These actions are arbitrary, capricious, and shock the conscience. These actions are also procedurally deficient and an arbitrary taking and violate Plaintiff's right to due process. U.S. CONST. AMEND. IV.

A. **Defendants revoked Plaintiff's Certificate of Occupancy without basis in any law.**

62.     Director Shannon issued his letter summarily revoking Plaintiff's Certificate of Occupancy but cited no statute, ordinance, order, decree, or proclamation authorizing his decision. That is because there is none. While the DSD Director is certainly empowered to revoke permits and certificates in the context of enforcing building codes, his unilateral action in this context is completely lacking any basis in law.

63.     At the time of his letter's issuance, the Tenth Addendum to the Mayor's Eighth Declaration was in effect. Neither the Eighth Declaration nor the Tenth Addendum say a word about enforcement of municipal or state COVID-19 restrictions via revocation of an occupancy permit. Likewise, under GA-29 and GA-32, the Governor did not authorize local officials to revoke occupancy permits either. The Director simply decided that Plaintiff's Certificate of Occupancy could be revoked because he said so.

64.     At best the Director's letter points to Chapter 10 of the City of San Antonio Code of Municipal Ordinances. Section 10-12(d) does provide that "the building official is authorized to suspend or revoke a certificate of occupancy … on the basis of incorrect information supplied, or where it is determined that the building or structure or portion thereof is in violation of any ordinance or regulation or any of the provisions of this chapter." However, none of those circumstances apply. No one has alleged that Plaintiff's "building or structure or portion thereof" violates any law. Director Shannon's decision to revoke Plaintiff's Certificate of Occupancy was based on alleged 'social distancing' violations. That decision was without basis in any law and therefore *ultra vires.*

**B.      Section 418.173 does not authorize revocation or Defendants' enforcement actions.**

65.      It was not until November 25, 2020—the day after Director Shannon's letter—that the Mayor issued the Eleventh Addendum. Even if the Eleventh Addendum retroactively applied, the Mayor has acted *ultra vires* by exceeding his statutory authority by purporting to make failure to comply with his decrees punishable as an offense under Texas Government Code Section 418.173.

66.      Section 418.173—titled "Penalty for Violation of Emergency Management Plan"—states that "[a] state, local, or interjurisdictional emergency management plan may provide that failure to comply with the plan or with a rule, order, or ordinance adopted under the plan is an offense." TEX. GOV'T CODE § 418.173(a).

67.      Nowhere in the plain language of Section 418.173 (or elsewhere in Chapter 418 for that matter), is a municipal official afforded unbounded power to unilaterally decide that violations of his orders are subject to occupancy permit revocation.  Section 418.173 is a narrowly defined penal law providing that an "offense" is punishable by a fine or confinement but the fine may not exceed $1,000 and the confinement may not exceed 180 days. TEX. GOV'T CODE § 418.173(b); *see Papachristou v. City of Jacksonville*, 405 U.S. 156, 162 (1972) (distinguishing criminal laws from "regulatory statutes governing business activities").

68.      The Legislature provided that "[t]he plan may prescribe a punishment for the offense *but may not* prescribe a fine that exceeds $1,000 or confinement in jail for a term that exceeds 180 days." TEX. GOV'T CODE § 418.173 (emphasis added). The words "'may not' imposes a prohibition and is synonymous with 'shall not.'" *Id*. at § 311.016(5). There is absolutely nothing in the Disaster Act that permits a governor, a state agency, or any local authority, to prescribe punishments for violating an order in excess of this crystal-clear statutory limitation.

**C.      The Eleventh Addendum contravenes GA-32's occupancy limitations.**

69.      GA-32 is the law of this state. "[T]o the extent necessary to ensure that local officials do not impose restrictions in response to the COVID-19 disaster that are inconsistent with [GA-32]," the Governor has suspended the Mayor's power to "control ingress to and egress from a disaster area under the jurisdiction and authority of the … mayor and control the movement of persons and the occupancy of premises in that area." TEX. GOV'T CODE § 418.108(g).

70.      Except for "bars," GA-32 provides that businesses "shall operate at no more than 75 percent of the total listed occupancy of the establishment" subject to various exceptions. This is an affirmative grant of authority for businesses to remain open to the public. The Eleventh Addendum, on the other hand, provides that "the City may exercise its authority … by revoking the Certificate of Occupancy for those violating businesses."

71.      In other words, the Eleventh Addendum conflicts with GA-32 because the City purports to have the authority to reduce a business's occupancy to zero percent so long as that decision is carried-out under the auspices of enforcing "compliance with the Mayor's Declaration and this Addendum." GA-32 authorizes nothing of the sort. The Mayor's promulgation of the enforcement provision in the Eleventh Addendum as well as the Defendants' decision to reduce Plaintiff's occupancy to zero percent, are *ultra vires* actions taken in contravention of the Governor's executive order.

**D.      Defendants do not have authority to shut off Plaintiff's Power.**

72.      Notwithstanding the illegality of Defendants' revocation of Plaintiff's certificate of occupancy, the DSD Director's authority to disconnect public utilities is limited to cases where "a structure is open, vacant, dilapidated or subject to any of the conditions defining public nuisance in this article." SAN ANTONIO MUN. CODE ORD. § 6-171. None of City's citations nor the

revocation of Plaintiff's Certificate of Occupancy were issued on this basis, nor could they have been, as there is nothing wrong with the building.

**Procedural Violations of Due Process**

73.     The Due Process Clause of the Fourteenth Amendment provides that no state shall "deprive any person of life, liberty, or property, without due process of law." U.S. CONST. AMEND. XIV, § 1.

74.     There can be no question that Plaintiff has a protected property interest in its Certificate of Occupancy. "[O]nce issued, a license or permit cannot be taken away by the State without due process." *Bowlby v. City of Aberdeen, Miss.*, 681 F.3d 215, 221 (5th Cir. 2012). In multiple respects, Defendants' summary revocation of Plaintiffs' Certificate of Occupancy violated fundamental due process guarantees.

> **A.     Defendants actions deprived Plaintiff of pre-deprivation process.**

75.      Pre-deprivation notice, when depriving someone of an important property interest, is "the root requirement of the Due Process Clause." *Cleveland Bd. of Educ. v. Loudermill*, 470 U.S. 532, 542 (1985). "[W]hen notice is a person's due, process which is a mere gesture is not due process." *"Mullane v. Cent. Hanover Bank & Tr. Co*., 339 U.S. 306, 315 (1950). The notice must be of such nature as reasonably to convey the required information and it must afford a reasonable time for those interested to make their appearance." *Id.*

76.     DSD officials' citations are so vague and conclusory that it cannot be said that they constitute sufficient notice at all. "Failure to implement health + safety" is a virtually meaningless allegation. (Exhibit C).   So too is "Emergency Declaration Violation 6ft social distancing no masks." (Exhibit D). None of these citations explain which "Emergency Declaration" was violated,

who violated them, or under what circumstances. These actions are also procedurally deficient and an arbitrary taking and violate Plaintiffs' right to due process. U.S. CONST. AMEND. IV.

77.     To compound matters, none of the citations issued at Plaintiff's establishment explained that failure to comply or that subsequent violations could result in termination of Plaintiff's Certificate of Occupancy. The Emergency Declaration forms—including the one declaring "Certificate of Occupancy Revoked"—state that failure to comply "may result in a summons to appear in Municipal Court" and that "[e]ach day that any violation of the above Public Health Emergency Ordinance continues" is a separate offence subject to a fine up to $1,000. (*See* Exhibit M, p. 2).

**B.      The Eleventh Addendum provides no adequate post-deprivation process.**

78.     The post-deprivation relief is non-existent. According to Director Shannon, the decision has been made—Plaintiff will have to reapply for a certificate of occupancy:

> "Once they go through that application process and we do an inspection and we feel that they are ready to heed our rules and regulations then we'll issue them an new certificate of occupancy but not until then[.]"

(*See* p. 11, n. 4, above).

79.     Not only is Plaintiff now required to repeat the lengthy and expensive application process, it must now satisfy the whims of municipal officials. Director Shannon has now declared that Plaintiff's Certificate of Occupancy cannot be restored and a new one will only be issued if City officials subjectively feel that Plaintiff will comply with "our rules and regulations." A promise that the post-deprivation process will be arbitrary and indefinite does not satisfy due process.

C.     **The Eleventh Addendum is an unconstitutional retroactive law.**

80.     A basic tenet of due process is that applying a new law to events occurring before it was enacted gives rise to due process concerns. "The Due Process Clause also protects the interests in fair notice and repose that may be compromised by retroactive legislation; a justification sufficient to validate a statute's prospective application under the Clause 'may not suffice' to warrant its retroactive application." *Landgraf v. USI Film Prods.*, 511 U.S. 244, 266 (1994) (citing *Usery* v. *Turner Elkhorn Mining Co.*, 428 U.S. 1, 17 (1976)). Retroactive application deprives parties of adequate notice and undermines "settled expectations." *Id.* A law is constitutionally defective if its retroactive application is "so harsh and oppressive as to transgress the constitutional limitation." *United States v. Hemme*, 476 U.S. 558, 568–69 (1986).

81.     The Eleventh Addendum was evidently issued in order to retroactively authorize the DSD's decision to revoke Plaintiff's certificate of occupancy. Indeed, prior to the Eleventh Addendum's issuance on November 25, 2020, there was no decree from any state, city, or county official specifying that violation of social distancing guidelines or face mask requirements could result in revocation of a commercial enterprise's certificate of occupancy. All potentially applicable orders only speak of the issuance of fines.

## APPLICATION FOR INJUNCTIVE RELIEF AND TEMPORARY RESTRAINING ORDER

82.     The purpose of temporary restraining order is to preserve the *status quo* until a hearing may be had on a temporary injunction. FED. R. CIV. P. 65. Plaintiff seeks a TRO against Defendants as follows:

(a)     Requiring Defendants to restore Plaintiff's Certificate of Occupancy until a temporary injunction hearing is held.

(b)     Require Defendants to produce within ten days all documentation, records, and communications in their possession relating to municipal efforts to enforce COVID-19 restrictions against Plaintiff, including records of any and all

complaints made against Plaintiff for alleged failure to comply with social distancing protocols.

83.     Plaintiff has valid causes of action against Defendants and a probable right to the relief sought. For the reasons detailed above, there is a substantial likelihood that Plaintiff will prevail after a trial on the merits because the Eleventh Addendum and the City's enforcement action are ultra vires of Defendants' authority under state law.

84.     Plaintiff has suffered irreparable injury. The Defendants' position is that Plaintiff cannot reopen—even under reduced occupancy limits—because revocation of its Certificate of Occupancy completely eliminates its ability to operate indefinitely. They have now threatened to disconnect Plaintiff's power. Unless a TRO is issued, Plaintiff will continue to suffer imminent and irreparable harm in the form of substantial impairment to the use and enjoyment of its property.

85.     Plaintiff lacks an adequate remedy at law. The harm Plaintiff will suffer between now and trial if not allowed to operate will result in the loss of business.

86.     Greater injury will be inflicted on Plaintiff by denial of injunctive relief than would be inflicted on the Defendants if the relief is granted. The effect of the requested TRO will be to allow Plaintiff to at least temporarily reopen. Without a TRO, Plaintiff will continue to indefinitely suffer the loss of income and the use and enjoyment of its property. Defendants, on the other hand, will not suffer any harm if a TRO is granted.

87.     The issuance of injunctive relief will not disserve the public interest. If a TRO is granted, Plaintiff intends on continuing to comply with the Governor's executive orders and all applicable health guidelines. Defendants cannot claim that a TRO will impair the public interest as they have allowed numerous equivalent establishments, namely restaurants, to remain open, despite their ostensible concern over the spread of the virus.

88.     Balancing the equities and other factors, the significant potential of irreparable harm to Plaintiff without injunctive relief, and the lack of harm due to entry of the injunctive relief demonstrate that an injunction is warranted.

## PRELIMINARY AND PERMANENT INJUNCTION

89.     Plaintiff asks the Court to set its application for preliminary injunction for a hearing, and after the hearing, issue a preliminary injunction against Defendants as follows:

(a)     Enjoin the Defendants from taking any action to disconnect Plaintiff's access to public utilities;

(b)     Restore to Plaintiff its Certificate of Occupancy revoked by the City of San Antonio's November 24, 2020 Letter; and

(c)     Enjoin the Defendants, its officers, agents, or employees, from enforcing any municipal COVID-19 decrees against Plaintiff, or instituting or continuing any enforcement against Plaintiff related municipal COVID-19 decrees by any means not directly and expressly authorized by GA 32 or a superceding order from the Governor of Texas.

90.     Plaintiff asks the Court to set its request for a permanent injunction for a trial on the merits, and after the trial, issue a permanent injunction as set forth above.

## DAMAGES

91.     Plaintiff is entitled to recover damages caused by Defendants' unlawful and unconstitutional acts which have caused Plaintiff economic loss resulting from Defendants' unlawful closure of its business.

## ATTORNEYS' FEES AND EXPERT COSTS

92.     Plaintiff requests payment of its reasonable attorneys' fees and costs. Plaintiffs are entitled to recover reasonable and necessary attorneys' fees and expert fees pursuant to 42 U.S.C. § 1988(b) and (c).

## CONCLUSION

For these reasons, Plaintiff RCI Entertainment (San Antonio), Inc., d/b/a XTC Cabaret respectfully requests that judgment be entered in its favor and that it be awarded the following forms of relief:

a.      Injunctive and declaratory relief as set forth above;

b.      Damages as set forth above;

c.      Attorneys' fees;

d.      Expert fees;

e.      Costs of suit; and

e.      All other relief, in law and in equity, to which Plaintiff may be justly entitled.

Respectfully submitted,

WALLACE & ALLEN, LLP

 /s/ Casey T. Wallace
Casey T. Wallace
State Bar No. 00795827
Benjamin W. Allen
State Bar No. 24069288
William X. King
State Bar No. 24072496
440 Louisiana, Suite 1500
Houston, Texas 77002
Tel: (713) 227-1744
Fax: (713) 227-0104
cwallace@wallaceallen.com
ballen@wallaceallen.com
wking@wallaceallen.com
**ATTORNEYS FOR PLAINTIFF**

## DECLARATION OF RODNEY YBARRA

1.      My name is Rodney Ybarra. I am over the age of twenty-one (21) years and am fully competent to make this declaration. All statements contained in this declaration are true and correct and are based on my personal knowledge. My usual place of business is located at 2023 Sable Ln., San Antonio, Texas, 78217.

2.      I have read the foregoing Verified Original Complaint and Application for Preliminary and Permanent Injunctive Relief. At all relevant times alleged in the Original Complaint, I have been the general manager for XTC Cabaret in San Antonio, Texas.

3.      Based on my knowledge of and involvement in the underlying events described in the Original Complaint, I verify that every factual statement stated therein is true and correct.

4.      I, Rodney Ybarra, declare under penalty of perjury that the above is true and correct and based on my personal knowledge. I am executing this declaration within the territorial limits of the United States of America.

EXECUTED in Bexar County, State of Texas on March 1, 2021.


RODNEY YBARRA